UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LAURIE TATE,

        Plaintiff,

    v.

FRANK BISIGNANO, Commissioner,
Social Security Administration,

        Defendant.

No. 23 CV 16421

Judge Georgia N. Alexakis

MEMORANDUM OPINION AND ORDER

Plaintiff Laurie Tate, an employee of the Social Security Administration, is suing Frank Bisignano, commissioner of the SSA, for violating Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, by refusing to allow her to work from home as an accommodation for her mental illness. Bisignano now moves for summary judgment or, alternatively, to limit Tate's recovery. For the following reasons, the Court denies Bisignano's motion.

I.    **Legal Standards**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). A genuine issue of material fact

exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 624 (7th Cir. 2001). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II. Facts

The following facts are taken from the parties' Local Rule 56.1 Statements of Material Fact, [50]; [52-1], and the exhibits submitted in support thereof.

Plaintiff Laurie Tate[1] has worked for the SSA since 2009. [50] ¶ 1; [47-3] at 10, 30:11–12. During the relevant period, she worked as a hearing customer service representative, [50] ¶ 2; [47-3] at 10, 31:5–9,[2] first in the SSA's office in Evanston, Illinois, and later in its Chicago office. [50] ¶ 1; [47-3] at 6, 15:17–22. While working in the Evanston office, Tate worked from home, which the SSA referred to as "telework," [50] ¶ 1; [47-4] at 42, two days per week, [50] ¶ 5; [47-3] at 89, 36:18–37:4. In 2016, she asked the SSA to allow her to telework four days per week to accommodate her diagnosed mental health condition, Bipolar Disorder, Type 1. [50] ¶¶ 7–9; [52-1] ¶ 1; [47-3] at 91, 43:11–15; [51-1] at 2. The SSA instead allowed her to relocate to its Chicago office, where she was able to telework three days per week. [50] ¶ 7; [52-1] ¶ 2; [47-3] at 92, 47:4–7; [47-4] at 13–15. Tate's direct supervisor at

---

[1] Tate was formerly known as Laurie Stanislowski. [50] ¶ 1; [47-3] at 75 ¶ 1.

[2] Citations to deposition transcripts first identify the ECF page number, followed by the transcript page number and lines.

the Chicago office, Dina LaMarche, knew of Tate's bipolar diagnosis as early as February 2018. [52-1] ¶ 4; [51-2] at 4.

In October 2019, the SSA's Chicago office reduced the number of days per week that employees were permitted to telework from three to two. [50] ¶ 12; [47-4] at 42. Following the reduction, Tate's mental health symptoms began to worsen. [52-1] ¶ 3; [47-3] at 99, 74:20–75:6. She submitted two reasonable accommodation requests, both asking to telework five days per week to accommodate her increasingly severe mental illness. [50] ¶ 13; [52-1] ¶ 5; [47-4] at 2–3, 5; [47-6] at 7. The first request was submitted by fax on November 19, 2019, and identified Tate's disabling condition as "mental illness." [50] ¶ 13; [47-4] at 3. Tate explained that "[d]ue to the severity of [her] illness," she found that her "symptoms are more easily triggered, such as, fears, sleeplessness, noises, sounds, light, voices and smells." [47-4] at 3. Tate added: "Because of this, I rarely leave my house." *Id.* The second request was submitted via SSA's "RA Wizard" on November 20, 2019, and identified Tate's disabling condition as "the severity of [her] psychiatric illness." [52-1] ¶ 5; [47-6] at 7. *Id.* The SSA later misrecorded her stated condition as "Mental illness—Depression and Anxiety." [52-1] ¶ 6; [47-4] at 5; [47-6] at 7.

To support her request, Tate submitted a letter from her psychiatrist, Dr. Katharine Porter, dated November 25, 2019. [50] ¶ 14; [52-1] ¶ 7; [47-6] at 10. The letter stated that Tate had "a documented mental disability" that "necessitate[d] excellent self-care, including adequate sleep and exercise." [50] ¶ 14; [47-6] at 10. In the letter, Dr. Porter "strongly recommend[ed] that [Tate] be allowed to work from

3

home for five days a week" because she "need[ed] the predictability and stability her home provides." [47-6] at 10. She explained that "the overstimulation caused by the lights, smells, and sounds at work and during the commute ha[d] worsened … [Tate's] symptoms and the accompanying anxiety," and Tate was experiencing "more and more difficulty focusing at work," such that, "without this accommodation, her stress may increase to such a degree that her condition may worsen, eventually preventing her from working altogether." *Id.*

In the month that followed, Tate discussed her accommodation request with her direct supervisor and her second-line supervisor. [50] ¶¶ 16–17; 19–21; [47-6] at 24–26; [47-5] at 2–8. She emailed her second-line supervisor, Scott Kargol, on November 27—one week after she submitted her request and two days after the date of her letter from Dr. Porter. [50] ¶ 14; [47-6] at 25. In that email, she asked what additional documentation she could provide to support her request and expressed concern that her disability—with which she "had decades of experience" and was "very real, painful and paralyzing"—was not being taken seriously because it was "not … as obvious as … a physical disability." [47-6] at 25; [50] ¶ 16. In his response two days later, Kargol assured Tate that "management [did] not want to make [her] current situation any worse" and was "working with [their] LR/ER specialist to see if [they] [could] accommodate [Tate's] request." [47-6] at 24; [50] ¶ 16. He also told her that they would "reach out to [her] if [they] need[ed] any additional information or documentation" and invited Tate to "stop by [his] office if [she] ha[d] any questions or wish[ed] to discuss anything further." [47-6] at 24.

4

The following week, Tate responded to Kargol and told him that she was "not doing well at all" and "[felt] like [her] head [was] going to explode." [47-6] at 24. She said that she was "already struggling trying to focus on [her] work" and detailed several problems that affected her focus, including her noisy co-worker, a sound "like a huge generator in the corner of the room or beneath the floor," the sound of trucks backing up, and the office's bright lights. [47-6] at 24; [50] ¶ 17. She also explained that she tried talking with her noisy co-worker—who Tate described as "by far the biggest distraction"—to no avail, and that she was unable to take her medication at work because it made her too drowsy. [47-6] at 24. Tate emphasized that she "just want[ed] to be able to do [her] job … and do it well," but would "be lucky enough if [she] [could] keep [her] job at this point." *Id.*

In early December 2019, a week after that second email to Kargol, Tate met with her direct supervisor, Dina LaMarche. [50] ¶ 19; [47-5] at 2–8. LaMarche told Tate that "it would be beneficial" for Tate to re-submit her November 25 letter from Dr. Porter on Dr. Porter's letterhead and with a physical signature from Dr. Porter, since the letter on file was not on letterhead and didn't have a physical signature. [50] ¶ 19; [47-5] at 5. LaMarche could not, however, elaborate on what information Dr. Porter should include in the letter. *Id.* Tate obtained a new copy of the letter and uploaded it to the RA Wizard within a few days. [47-5] at 2.

During the same meeting, Tate told LaMarche about the noise distractions that she had been experiencing in the office. [50] ¶ 20; [47-5] at 5. In response, LaMarche offered to let Tate move to a new cubicle, but Tate declined because she

did not believe it would help. *Id.* In an email the next day, LaMarche also offered noise-cancelling headphones and a white noise machine. [50] ¶ 21; [47-5] at 4. Tate declined the offer and explained to LaMarche that wearing noise cancelling headphones would exacerbate her mental illness, the symptoms of which included auditory hallucinations. [50] ¶ 22; [47-6] at 7. Tate's email conversation with LaMarche tapered off around December 17, [47-5] at 2, just under one month after Tate's initial reasonable accommodation request, [50] ¶ 13; [47-4] at 3.

On February 26 (about three months after Tate's November 19 reasonable accommodation request, [50] ¶ 13; [47-4] at 3), Tate took a leave of absence, [50] ¶ 43; [47-3] at 65 ¶ 10, first using advanced sick leave and then using leave available under the Family Medical Leave Act, 29 U.S.C. §§ 2601–2654, [50] ¶ 46; [47-5] at 10, 13. She later explained in a deposition that she needed "a lot of time off" and had gotten "to the point where [she] needed to not work." [50] ¶ 67; [47-3] at 18, 64:23–65:7. She had experienced a worsening of her mental health symptoms, including heightened sensitivity to light, sounds, and smells; difficulty sleeping; and increasingly persistent auditory hallucinations. [50] ¶¶ 49, 51–54, 56–58; [47-3] at 18, 62:6–67:11. About two weeks after going on leave, Tate filed a formal EEOC complaint of discrimination because the SSA had not yet granted (or denied) her reasonable accommodation request. [50] ¶ 36; [47-6] at 2–3.

Meanwhile, Tate's request wended its way through the SSA's approval process. Tate's supervisors, LaMarche and Kargol, did not have the authority to approve or deny her request. [50] ¶ 18; [47-4] at 27 ¶ 12. Only the Regional Chief Administrative

Law Judge, John Rabaut, could approve the request, and only the National Reasonable Accommodation Coordinator ("NRAC"), Tamara Stenzel, could deny the request. [50] ¶¶ 18, 24; [47-4] at 26 ¶¶ 7–9. A Reasonable Accommodation Coordinator, Jason Markley, assisted Rabaut in liaising with LaMarche, Kargol, and Stenzel. [50] ¶ 24; [47-4] at 26 ¶ 10.

At some point before January 3, 2020, LaMarche and Kargol had recommended to Markley that Rabaut approve Tate's request, and Markley informed Rabaut of their recommendation. *See* [52-1] ¶ 10; [47-4] at 27 ¶ 12; [47-4] at 31. Rabaut nevertheless did not approve the request and instructed Markley to submit a form recommending denial to Stenzel. [50] ¶¶ 18, 24; [47-4] at 27–28 ¶ 13. Markley did so on January 7, 2020. [47-4] at 27–28 ¶ 13. The form cited "insufficient portable work/need for employee to perform in-office duties" as the basis for the recommended denial. [50] ¶ 24; [47-4] at 32. Neither LaMarche nor Kargol had ever informed Markley or Rabaut that there was insufficient portable work or a need for Tate to perform in-office duties. [47-4] at 28 ¶ 15; [47-4] at 36. The form also erroneously identified Tate's disability as "depression and anxiety." [52-1] ¶ 6; [47-4] at 5; [47-6] at 7.

On March 18—more than two months after Markley submitted Rabaut's denial recommendation, [50] ¶ 24; [47-4] at 27–28 ¶ 13, nearly four months after Tate's original request, [50] ¶ 13; [47-4] at 3, 5, and just under one month after Tate went on leave, [50] ¶ 43; [47-3] at 65 ¶ 10—Donna Bates, an analyst with the NRAC's office, sent Tate a letter informing her of Rabaut's recommendation. [50] ¶ 25; [47-4] at 28

7

¶ 14; [47-4] at 36; [47-5] at 33–34. The letter stated that the recommended denial was "due to insufficient portable work, and the need for [Tate] to perform in-office duties." [50] ¶ 25; [47-5] at 33. It also stated that "management offered as alternative accommodations, to move [Tate's] workstation and noise cancelling headphones, which [Tate] declined." [47-5] at 33. The letter did not discuss inadequacies with Tate's documentation, but it did invite her to discuss her request over the phone and to submit additional documentation. [50] ¶ 25; [47-4] at 25 ¶ 14; [47-5] at 33; [47-6] at 7–8.

Bates's letter initiated a discussion about Tate's request that lasted about one week. On March 19, LaMarche emailed Bates to clarify that neither she nor Kargol had recommended denial due to lack of portable work. [47-4] at 36. The same day, Tate also emailed Bates. Tate's email stated that she sought an accommodation "due to the severity of [her] psychiatric illness," not just "depression and anxiety." [52-1] ¶ 11; [47-6] at 7. It also stated that Tate had explained to LaMarche when declining alternative accommodations that the alternatives would "only exacerbate [her] disease." [50] ¶ 26; [52-1] ¶ 12; [47-6] at 7.

Tate and Bates spoke over the phone a few days later. [50] ¶ 27; [47-5] at 36–38. During the conversation, Tate told Bates that she had been diagnosed with bipolar, mania, paranoia, depression, anxiety, and PTSD in 1993 and experiences symptoms such as difficulty sleeping, delusional thoughts, hallucinations, "loss of reality," and depressive episodes. [52-1] ¶ 14; [47-5] at 36. She explained that she felt

8

especially angry and agitated while at work, where she often felt claustrophobic, as if "the walls [were] closing in on her." *Id.* at 36–37.

> Tate also described to Bates how the commute to the office affected her:
>
> [S]he drives about four miles to the train station in the morning. … [S]he waits about 10 minutes for the train to arrive. … [W]hile she waits, she begins to feel hot, her heart races, she starts breathing heavy, she gets fearful of anyone that walks or comes near her, she starts shaking, crying and she feels like she is going to scream. … [O]nce the train arrives, she gets on and goes to the bathroom to get herself together. … [S]he cannot stay in the bathroom too long, because she is claustrophobic and the bathroom is really small and tight. … [S]he rides on the train for 40 minutes and once the train stops, she has to walk about another 10 minutes before she arrives to work. … [M]ost of the time, she runs to the building because she feels like people are watching her and are trying to hurt her. … [S]he gets in her car at 7:15am, but she does not arrive to work until 9:00am or 9:15am if the traffic is bad. … [B]y the time she gets to work, she is tired and frazzled.

*Id.* at 37. Because "the whole commute [was] a mental strain on her," Tate believed that mobility or paratransit services would not help her. *Id.*; [50] ¶ 27. She also told Bates about LaMarche's offer of alternative accommodations but said that "the only thing that will really help … is to be able to telework." [50] ¶ 27; [47-5] at 38. "LaMarche is really nice and compassionate," she explained, "but no one really understands." [47-5] at 38.

On April 20, 2020—just under a month after Tate's discussion with Bates, [50] ¶ 27; [47-5] at 36–38, and five months after her reasonable accommodation request, [50] ¶ 13; [47-4] at 3, 5—the NRAC, Stenzel, officially denied Tate's request. [50] at ¶ 29; [47-5] at 29–31. In a letter notifying Tate of the denial, Stenzel described Tate's conversation with Bates, saying that Tate "explained that [she] requested full-time telework … because of increased stress at work due to short staffing and distractions

9

such as lights, smells, and sounds while commuting to work" and "further explained that [her] commute exacerbate[d] [her] anxiety symptoms, which decrease[d] [her] ability to focus." [47-5] at 30. The letter also stated that Tate's medical documentation was "insufficient to establish that full-time telework … [was] necessary to enable [her] to perform the essential functions of [her] job" because the November 2019 letter from Dr. Porter "[did] not explain how [full-time telework] would address [Tate's] limitations with overstimulation caused by the lights, smells, and sounds at work and during [her] commute" and why Tate could not "utiliz[e] other forms of transportation to commute to work." [50] ¶ 29; [47-5] at 30. The letter also stated that the alternative accommodations offered by LaMarche and declined by Tate—relocating Tate's workstation and providing her with noise-canceling headphones—would "enable [Tate] to perform the essential functions of [her] job." [47-5] at 30.

On May 15, Tate asked Stenzel to reconsider her denial and submitted an additional letter from Dr. Porter. [50] ¶¶ 30, 32; [52-1] ¶¶ 17–19; [47-5] at 17–19. Stenzel reaffirmed the denial nearly six months later. [50] ¶ 34; [47-4] at 10–11.

On June 2, 2020, while her request for reconsideration was pending, Tate returned to work. [50] ¶ 47; [52-1] ¶ 31; [47-3] at 21, 76:6–21. She was able to work from home in accordance with the SSA's COVID-19 policy, which took effect on March 21, 2020. [50] ¶ 44; [52-1] ¶ 30; [47-5] at 15. In March 2022, she again requested full-time telework as a reasonable accommodation, and her request was granted in July 2022, subject to annual review. [50] ¶¶ 39, 42; [47-6] at 21–22. She was able to work from home for the entire period from her return to work in June 2020 until the

10

granting of her reasonable accommodation request in July 2022. [50] ¶ 47; [52-1] ¶ 30; [47-3] at 21, 76:8–10. During that time, Tate's mental health symptoms decreased, [52-1] ¶ 30; [47-3] at 24, 87:7–12, and she took no sick leave, [52-1] ¶ 31; [47-3] at 21, 76:11–21. She has always gotten good reviews, [50] ¶ 66; [47-3] at 96, 62:21–22, and was promoted in 2023, [50] ¶ 2; [47-3] at 10, 31:9–18.

The EEOC eventually denied Tate's February 2020 complaint, [50] ¶ 37; [47-6] at 14–19, 28–29, and later affirmed the denial, [50] ¶ 38; [47-6] at 37–41. This lawsuit soon followed. [1]. Tate seeks backpay for the unpaid FMLA leave that she took in 2020, reimbursement to her leave bank for the annual leave and sick leave that she took in 2020, compensatory damages, attorney's fees, and costs of suit.[3] [50] ¶ 76; [52-1] ¶ 34; [47-3] at 76 ¶ 3. The SSA now moves for summary judgment or a bar on reimbursement of leave hours and backpay for leave taken after the SSA's March 21, 2020 implementation of full-time telework. [47] at 1; [50] ¶ 44; [47-5] at 15.

---

[3] Tate also states that she seeks a "permanent accommodation of full-time telework," [49] at 11 n.2; [49-1] ¶ 34, which is apparently a request to avoid the required annual review of the full-time telework accommodation that she currently receives, [50] ¶¶ 39, 42; [47-6] at 21–22. Tate may not seek elimination of the annual-review requirement, which pertains to her 2022 reasonable accommodation request, in this lawsuit, which pertains to her 2020 reasonable accommodation request. The court previously assigned to this case dismissed "[a]ny claim that an annual review of plaintiff's telework accommodation amounted to disability discrimination … for the failure to exhaust administrative remedies." [26] at 1. It reasoned that Tate only administratively exhausted her claim that the denial of or delay in granting full-time telework was discriminatory, which is distinct from any claim that a required annual review is discriminatory. *Id.* at 2. In this litigation, Tate may therefore seek redress only for the 2020 denial of or delay in granting full-time telework, and is precluded from seeking an order requiring the SSA to allow her to telework full time without any annual review.

### III.   Analysis

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability … be subjected to discrimination under any program or activity conducted by any Executive agency." 29 U.S.C. § 794. It applies the standards of Title I of the Americans with Disabilities Act, 42 U.S.C. §§ 12111–12117, to federal employers, 29 U.S.C. § 794(d), requiring them to reasonably accommodate the known physical and mental disabilities of qualified employees, *McCray v. Wilki*, 966 F.3d 616, 620–21 (7th Cir. 2020). Qualified employees whose employers fail to accommodate their disabilities are entitled to any remedies that would be available under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e–2000e-17, including compensatory and punitive damages, 42 U.S.C. 1981a(a)(2), and any equitable relief the court deems appropriate, including back pay, 42 U.S.C. § 2000e-5(g)(1). 29 U.S.C. § 794(a)(1). To prevail on a failure-to-accommodate claim, a plaintiff must establish that: (1) the plaintiff is a qualified individual with a disability; (2) the employer was aware of the disability; and (3) the employer failed to reasonably accommodate the disability. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 813 (7th Cir. 2015).

Bisignano believes that, as a matter of law, he should not be liable for failing to accommodate Tate's disability because Tate was not a "qualified individual" and because the SSA did not fail to reasonably accommodate Tate's disability. He also believes that Tate should be precluded from recovery of damages, backpay, or leave reimbursement arising from any leave that Tate took after the SSA implemented its

COVID-19 telework policy on March 21, 2020. The Court disagrees on all three points, as explained below.

## A. Qualified Individual with a Disability

Bisignano contends that Tate has failed to raise a material factual dispute that she was a "qualified individual." [47] at 8. The ADA (incorporated by reference into Section 504) defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of [their] position." 42 U.S.C. § 12111(8); *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 852 (7th Cir. 2015). "Whether someone is a 'qualified individual' is assessed at the time of the relevant events."[4] *Sansone v. Donahoe*, 98 F. Supp. 3d 946, 955 (N.D. Ill. 2015) (citing *Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 975 (7th Cir. 2009)).

According to Bisignano, Tate was not a qualified individual because Tate did not immediately return from her leave of absence when the SSA implemented its COVID-19 telework policy, which would have allowed Tate to work from home five days per week as she had requested. [47] at 9; [50] ¶ 44; [52-1] ¶ 30; [47-5] at 15. He points to deposition testimony in which Tate said that she declined LaMarche's offer to move cubicles because she "was so far gone," she "needed, really, just not to work," and she "needed … a lot of time off." [47] at 9; [47-3] at 18, 64:9–13, 65:3–5. This

---

[4] This statement of the law by Judge Shadur is a helpful reframing of the oft-cited rule that courts determine whether a person is qualified by considering whether they can "perform the essential functions of their job at the time the employer makes the allegedly discriminatory employment decision." *See, e.g., Ammons v. Aramark Unif. Servs.*, 368 F.3d 809, 818 (7th Cir. 2004). While the usual framing of the rule works well enough when considering whether a particular adverse action was discriminatory, it is less helpful in failure-to-accommodate cases, where delays can result in liability—in other words, where the *lack* of a decision is itself a type of decision. *See, e.g., McCray*, 966 F.3d at 621.

evidence, Bisignano argues, establishes that Tate would not have been able to perform the essential functions of her job even with her requested accommodation of full-time telework. [47] at 9.

But there is other evidence suggesting that Tate was able to perform the essential functions of her job. For starters, at the time she declined LaMarche's offer of alternative accommodations—the time about which she later stated that she "needed, really, just not to work," [47-3] at 18, 64:12–13—she *was* working. She declined LaMarche's offer on December 12, 2019, [47-5] at 5, but she didn't take her leave of absence until more than two months later, on February 26, 2020, [50] ¶ 43; [47-3] at 65 ¶ 10.

It is of no moment that Tate did not immediately return from leave when the SSA implemented its COVID-19 telework policy. It wasn't clear at the time how long the policy would last. *See* [47-3] at 99, 75:23–24 ("[E]ven though it was COVID-19, I don't know when it's gonna end."). And Tate testified that, when the SSA implemented its COVID-19 telework policy in March 2020, she "needed more time" because her "symptoms were still … highly sensitive." [47-3] at 99, 77:8–10. Taking leave to recover from an illness does not necessarily disqualify a person from entitlement to a reasonable accommodation under Section 504 or the ADA; such leave can even constitute a reasonable accommodation under certain circumstances. *Coffey-Sears v. Lyons Twp. High Sch. Dist. 204*, No. 15-cv-08642, 2017 WL 1208439, at *9 (N.D. Ill. Mar. 31, 2017) (collecting cases). This isn't to say that Tate's time off somehow amounted to an accommodation; rather, it is to demonstrate that her taking

14

leave does not automatically preclude a reasonable jury from finding that she is a "qualified individual." *Hooper*, 804 F.3d at 852.

Bisignano disagrees. He asserts that "[w]hen an employee is unable to perform the essential function of *attending* his employment, few, if any, reasonable accommodations exist." [47] at 9 (quoting *Amadio v. Ford Motor Co.*, 283 F.3d 919, 928 (7th Cir. 2001)). In *Amadio*, the court held that the plaintiff was not a qualified individual because, in three years of employment, he had taken 23 medical leaves totaling 18 months and had been disciplined several times for his absenteeism. Here, in contrast to *Amadio*, Tate's leave of absence was confined to a discrete period from February 26, 2020, to June 1, 2020. And, when Tate returned from leave, she was able to perform her job while teleworking five days per week. She took no sick leave for more than two years, [52-1] ¶ 31; [47-3] at 21, 76:11–21, received consistently good reviews, [50] ¶ 66; [47-3] at 96, 62:21–22, and was eventually promoted, [50] ¶ 2; [47-3] at 10, 31:9–18. A reasonable juror could conclude that, when allowed to telework as she had requested, Tate was able "to perform the essential function of attending [her] employment." *Amadio*, 283 F.3d at 928.

Considering all this evidence, a jury could reasonably conclude that Tate was a qualified individual "at the time of the relevant events," *Sansone*, 98 F. Supp. at 955—when Tate made her reasonable accommodation request, when the SSA formally denied her request, and in the five months between.

15

### B. Failure to Reasonably Accommodate

#### 1. Reasonableness of Alternative Accommodations

Bisignano next contends that there is no genuine dispute that the SSA failed to reasonably accommodate Tate's disability because the SSA offered alternative reasonable accommodations. [47] at 9. After all, "it is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests." *Jay v. Intermet Wagner, Inc.*, 223 F.3d 1014, 1017 (7th Cir. 2000). The record clearly establishes that Tate's supervisor, LaMarche, offered to move her workstation and provide her with noise-cancelling headphones and a white noise machine. [50] ¶¶ 20–21; [47-5] at 4–5. The question, then, is whether those alternative accommodations satisfied the SSA's duty to reasonably accommodate Tate's disability. "An employer satisfies its duty to reasonably accommodate an employee with a disability when the employer does what is necessary to allow the employee to work in reasonable comfort." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 840 (7th Cir. 2012).

Bisignano argues that the alternative accommodations that LaMarche offered satisfied the SSA's duty because they were directly responsive to the concerns that Tate communicated to the SSA through her conversations with her supervisors, LaMarche and Kargol. [47] at 10–11. The offer was made in response to Tate's complaints to LaMarche about a noisy co-worker. [50] ¶¶ 20–21; [47-5] at 4–5. But it is not clearly responsive to another complaint that Tate had made to Kargol about the office's bright lights. [50] ¶ 17; [47-6] at 24. That aside, Tate's reason for declining the alternatives was not that they weren't responsive to her noise complaints: she

declined the cubicle move because it would be ineffective, [50] ¶ 20; [47-5] at 5, and the noise-cancelling headphones and white-noise machine because they would exacerbate her illness, [50] ¶ 22; [47-6] at 7.

More importantly, the offered accommodations were not fully responsive to the broader concerns that Tate communicated in the totality of her communications with the SSA. Although the SSA was not required to provide the "exact accommodation" Tate requested, it still had "an obligation to provide a *reasonable* accommodation that account[ed] adequately for [Tate's] limitations." *Sansone*, 98 F. Supp. 3d at 954 (emphasis in original). In addition to the documented communications with Kargol and LaMarche, Tate communicated her limitations through a letter from her psychiatrist, Dr. Porter, [50] ¶ 14; [52-1] ¶ 7; [47-6] at 10, and a discussion with an analyst with the NRAC's office, Bates, [50] ¶ 27; [47-5] at 36–38. The November 2019 letter from Dr. Porter stated not only that the symptoms of Tate's mental illness were exacerbated by "the lights, smells, and sounds at work and during the commute" but also that Tate "need[ed] the predictability and stability her home provides." [47-6] at 10. In addition, in her conversation with Bates, Tate provided much more detail about the scope of her mental illness, which included diagnoses of bipolar and PTSD and symptoms such as difficulty sleeping, delusional thoughts, hallucinations, "loss of reality," and depressive episodes. [52-1] ¶ 14; [47-5] at 36. Tate explained to Bates that her symptoms were worst at work, where she felt especially angry and agitated and often felt claustrophobic. [47-5] at 36–37. Tate's communications with Bates also emphasized the mental toll that a commute to work—by car, by train, and by walking

17

the last leg—placed on her, leaving her feeling "tired and frazzled" by the time she arrived. [47-5] at 37.

Drawing all reasonable inferences in Tate's favor as the Court must do at this stage, *Bennington*, 275 F.3d at 658, the "lights, smells, and sounds at work and during the commute" could be understood as specific illustrative examples of ways in which Tate's workplace fell short of the "predictability and stability" that she needed. [47-6] at 10. Thus, to "allow [Tate] to work in reasonable comfort," *Hoppe*, 692 F.3d at 840, a reasonable jury could find that an accommodation would have to address Tate's need for predictability and stability, not just the specific noise- and light-related complaints that she articulated to LaMarche and Kargol. Indeed, there is evidence suggesting that LaMarche and Kargol held this view: They both recommended allowing Tate to telework full time, [52-1] ¶ 10; [47-4] at 27 ¶ 12, and LaMarche used language when offering Tate the alternative accommodations that can be understood as recognizing that the alternatives were intended as stopgaps pending approval of Tate's actual request. *See* [47-5] at 4 ("If you think it could help … *for the time being*, we are happy to make those arrangements.") (emphasis added).

Bisignano dismisses Tate's proffered reason for declining the alternative accommodations as "mak[ing] no sense" because the alternatives "could directly address noise problems." [52] at 12. But the record reflects a sensible explanation from Tate: that the alternatives would exacerbate her illness, specifically, her auditory hallucinations. [50] ¶ 22; [47-6] at 7. Indeed, Bisignano's argument lends credence to what Tate conveyed in her conversations with Kargol and Bates: that her

18

disability, which was "very real, painful and paralyzing," was not being taken seriously because it was "not … as obvious as a physical disability," [50] ¶ 16; [47-6] at 25, and that "no one really understands." [47-5] at 38. That individuals at the SSA did not appreciate the full scope and effect of Tate's mental disability does not provide a basis for granting Bisignano's motion when, given the record, a reasonable jury could find that Tate was clear about what she needed (full-time telework) and her psychiatrist explained why she needed it ("predictability and stability," which would facilitate "excellent self-care, including adequate sleep and exercise," [47-6] at 10). *See Ekstrand*, 583 F.3d at 977 (holding that, once the defendant was aware of the medical necessity of the plaintiff's requested accommodation, the defendant was obligated to provide the accommodation unless it would impose an undue hardship); *Sansone*, 98 F. Supp. 3d at 954 ("Because [plaintiff] conveyed his limitations, a reasonable factfinder—with [plaintiff's] version of the facts taken as true for summary judgment purposes—could conclude that [defendant] never offered him an arrangement that reasonably met his needs.").

Bisignano also argues that Tate's belief that the alternatives would not effectively alleviate her symptoms need not be taken seriously because Tate also experienced symptoms, including difficulty sleeping, when working from home. [47] at 11; [52] at 11–12. But an employer's obligation is to do "what is necessary to allow the employee to work in reasonable comfort." *Hoppe*, 692 F.3d at 840. It is not to cure the employee's disability. The fact that Tate experienced the symptoms of her

19

disability even with her requested accommodation does not mean that she was unjustified in declining alternatives that did not address her needs.

Considering all this evidence, a reasonable jury could conclude that the SSA's offer of alternative accommodations did not satisfy its duty to reasonably accommodate Tate's disability.

## 2. The Interactive Process

"As part of its ADA obligations, an employer often engages with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Igasaki v. Ill. Dep't of Fin. and Pro. Regul.*, 988 F.3d 948, 961 (7th Cir. 2021) (quotation marks and citation omitted). "Both parties are required to make a good faith effort to determine what accommodations are necessary, but if a breakdown of the process occurs, courts should attempt to isolate the cause and then assign responsibility." *Lawler v. Peoria Sch. Dist. No. 150*, 837 F.3d 779, 786 (7th Cir. 2016) (cleaned up and citation omitted). A plaintiff's "apparent displeasure with the way in which [the defendant] decided on that accommodation, or with its failure to provide the exact accommodation he would have preferred, is irrelevant." *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 683 (7th Cir. 2014). "Still, at the very least, the employer is obliged to provide an accommodation that effectively accommodates the disabled employee's limitations." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005).

Bisignano argues that Tate is responsible for a breakdown of the interactive process because she declined the alternative accommodations offered by LaMarche. [47] at 11. In his view, the SSA's offer of alternative accommodations was made in

20

good faith, while Tate's refusal was not. To be sure, an employee's refusal to consider alternatives can sometimes "doom[] the interactive process." *Yochim*, 935 F.3d at 592. For example, in *Yochim*, the plaintiff asked to telework three to five days per week for six months to accommodate her inflammatory osteoarthritis, which caused pain, stiffness, and swelling throughout her body. *Id.* at 589. Her doctor recommended telework to minimize the risk of discomfort from commuting and to accommodate her physical therapy appointments. *Id.* at 590. But, a few months before submitting her request, the plaintiff had lost her telework privileges due to poor performance while teleworking during recovery from hand surgery. *Id.* at 589. Her supervisor therefore offered her a list of alternative accommodations, including an ergonomic assessment, additional paralegal assistance to reduce typing, a four-day-per-week schedule, and generous leave approval—but not the telework that she had requested. *Id.* at 590. The plaintiff registered her displeasure with the alternatives but never sought reconsideration. *Id.* The court blamed the plaintiff for the breakdown in the interactive process because she insisted on teleworking without ever attempting to explain why the proffered alternatives did not meet her needs. *Id.* at 591–92.

Here, however, Tate's refusal of the alternatives offered by LaMarche did not doom the interactive process. The SSA was obligated "to provide an accommodation that effectively accommodate[d] [Tate's] limitations." *Sears, Roebuck*, 417 F.3d at 802. But as discussed above, and unlike *Yochim*, 935 F.3d at 592, a reasonable jury could conclude that it did not. *See supra* Section III.B.1. And, also unlike *Yochim*, 935 F.3d at 592, the SSA's failure was not due to Tate's lack of explanation. Tate explained to

both LaMarche and Bates that (and how) the alternatives would exacerbate her illness, [50] ¶ 22; [47-6] at 7, and gave Bates a detailed description of her illness and its effects on her work and commute, [50] ¶ 27; [47-5] at 36–38. Considering this evidence, a reasonable jury could conclude that Tate was not responsible for a breakdown of the interactive process.

Bisignano also argues that the SSA's good-faith engagement in the interactive process should shield it from liability for failure to accommodate. [47] at 11–12. But a reasonable juror could conclude that the SSA did not engage in good faith. A comparison with *Keen v. Merck Sharp & Dohme Corp.*, 819 F. App'x 423 (7th Cir. 2020), which Bisignano cites in support of his contention, is illustrative. There, the plaintiff's employer had provided her with a company car. 819 F. App'x at 425. At some point, the plaintiff asked for a new car to accommodate her degenerative neck condition because she needed a car with headrests that adjusted both vertically and horizontally. *Id.* None of the cars in the employer's fleet met that criterion, so the employer ordered the plaintiff a customized Chevy Traverse, which did. *Id.* The plaintiff used the Traverse for more than a year before requesting a different car—a Chevy Tahoe. *Id.* The Tahoe did not have the four-way adjustable headrest that the plaintiff had specifically requested. *Id.* After speaking with the plaintiff's doctor, who provided no reason why the Tahoe seat was better than the Traverse, the employer offered to let the plaintiff use her own car and receive reimbursement for mileage. *Id.* It also repaired the Traverse seat after learning that it was damaged. *Id.*

22

Thus, in *Keen*, the employer bent over backwards to accommodate the plaintiff—including granting a specifically requested accommodation at significant cost—before rejecting her request for a Tahoe. The court rejected the plaintiff's failure-to-accommodate claim, reasoning that her employer had given the request "serious and genuine" consideration. *Id.* at 427–28. Here, unlike in *Keen*, 819 F. App'x at 425, there is no evidence that the SSA bent over backwards to accommodate Tate.

On the contrary: there is evidence suggesting that the SSA's refusal of full-time telework was in bad faith. Tate provided medical documentation explaining that her mental illness necessitated "the predictability and stability her home provides," [47-6] at 10, and she made repeated efforts to ensure the adequacy of the documentation that she provided, [50] ¶¶ 16, 19; [47-5] at 2–5; [47-6] at 7, 25. When LaMarche told Tate that her medical documentation needed to be on her psychiatrist's letterhead, Tate resubmitted the letter on appropriate letterhead. [50] ¶ 19; [47-5] at 2, 5. Kargol told her that someone would reach out if they needed additional documentation. [50] ¶ 16; [47-6] at 24. No one did.

When Bates contacted Tate months later to tell her that Rabaut had recommended denial of the request, the only reason she gave for the recommended denial was "insufficient portable work, and the need for [Tate] to perform in-office duties." [50] ¶ 25; [47-5] at 33. But this reason does not appear to have any factual basis. Neither of Tate's supervisors told Markley or Rabaut that there was insufficient portable work; they both recommended granting Tate's request. [52-1] ¶ 10; [47-4] at 27–28, 36. And Bisignano concedes that there were no job duties that

required Tate to work in the office. [52-1] ¶ 29; [47-3] at 11, 34:16–19. Most importantly, Bates gave no indication that Tate's documentation was inadequate. *See* [50] ¶ 25; [47-5] at 33. And yet, when the NRAC, Stenzel, ultimately denied Tate's request, she told Tate—for the first time in the five months since Tate had submitted her reasonable accommodation request—that her medical documentation was inadequate because it "d[id] not explain how [her] requested accommodation would address [her] limitations with overstimulation caused by the lights, smells, and sounds and work and during [her] commute." *See* [50] at ¶ 29; [47-5] at 30. On this record, a reasonable juror could conclude that this denial was in bad faith.

* * *

Because a reasonable juror could conclude that Tate was a qualified individual and that the SSA failed to reasonably accommodate her disability, the Court denies Bisignano's motion for summary judgment.

### C.    Damages Cap

Bisignano moves to bar damages, backpay, and reimbursement of leave hours arising from any events following March 21, 2020, the date on which the SSA implemented full-time telework in response to the COVID-19 pandemic. [47] at 13–15. He argues that Tate could have returned to work on that date with her preferred accommodation of full-time telework but chose not to. For support, he points to two cases in which plaintiffs' failure-to-accommodate claims failed because the plaintiffs, who had requested telework as an accommodation, had been permitted to telework either temporarily or informally. [47] at 14 (citing *Molumby v. Averill*, No. 4:23-cv-

24

04152-SLD, 2025 WL 697648, at *5 (C.D. Ill. Mar. 4, 2025); *Solloway v. White*, No. 1:13-CV-03827-TWT-WEJ, 2017 WL 1170895, at *27 (N.D. Ga. Feb. 15, 2017)).

In those cases, the plaintiffs were able to and did telework during the period at issue. *Molumby*, 2025 WL 697648, at *5; *Solloway*, 2017 WL 1170895, at *27. Here, in contrast, Tate seeks redress for a period in which she was on leave and not able to telework. [50] ¶ 43; [47-3] at 65 ¶ 10; [47-3] at 99, 75:23–24. Further, there is evidence that would allow a reasonable juror to conclude that Tate needed to continue her leave past March 21 to recover from an aggravation of her illness that would not have occurred if she had been permitted to telework sooner. *See* [47-6] at 10 (stating, in a letter from Dr. Porter, that "I am concerned that without [full-time telework], [Tate's] stress may increase to such a degree that her condition may worsen, eventually preventing her from working altogether").

Bisignano thus could be liable for the entirety of Tate's leave if the SSA was unreasonable in not granting telework before Tate began her leave on February 26, [50] ¶ 43; [47-3] at 65 ¶ 10. *McCray*, 966 F.3d at 621 (holding that employers can be liable for unreasonable delays in accommodating an employee's known disability). Whether a delay is unreasonable depends on the totality of the circumstances, including the employer's good faith in attempting to accommodate the disability; the length of the delay; the nature, complexity, and burden of the accommodation requested; and whether the employer offered alternative accommodations. *Id.*

Here, Tate's requested accommodation of full-time telework was not particularly complex or burdensome. Tate had previously worked from home three

25

days per week, [47-3] at 93, 51:4–5, so full-time telework would not have required any additional infrastructure or equipment. The parties agree that Tate did not need to be present in the office to perform her job duties, [52-1] ¶ 29; [47-3] at 11, 34:16–19, and Bisignano has not identified any burdens that Tate's telework would have imposed on other employees. Moreover, LaMarche and Kargol both recommended granting Tate's request, [52-1] ¶ 10; [47-4] at 27 ¶ 12, and the SSA was able to transition immediately to full-time telework for almost all employees in response to the COVID-19 pandemic, [50] ¶ 44; [47-5] at 15, further suggesting that Tate's request was not complex or burdensome.

Bisignano argues that the SSA's delay was reasonable because "the SSA engaged in various discussions with Tate," including "offering her alternative accommodations." [52] at 5. True, the SSA offered alternative accommodations, [50] ¶¶ 20–21; [47-5] at 5; [47-6] at 4, and a delay is less likely to be unreasonable when it resulted from good-faith offers of alternative accommodations, even when the alternatives ultimately proved insufficient. For instance, in *Cloe v. City of Indianapolis*, 712 F.3d 1171 (7th Cir. 2013), the plaintiff requested a nearby parking space to accommodate her disability, which made it difficult for her to walk *Id.* at 1174. The city gave her a parking pass for a lot that was closer to her workplace, but the pass did not solve her problem because, often, all but the most distant spots in the lot were filled. *Id.* at 1177. She notified her employer of the problem, and the employer gave her a pass to a different lot. *Id.* at 1177–78. That lot proved to have the same problem. *Id.* at 1178. Eventually, five months after requesting a nearby

parking space, the plaintiff was assigned a specific parking spot. *Id.* at 1178. The court held that the five-month delay was reasonable because the employer "had no way of knowing that its other seemingly reasonable accommodations … would be insufficient" and "acted with reasonable speed" to offer new accommodations when it found out that they were. *Id.* at 1178–79.

Here, unlike *Cloe*, *id.*, a reasonable juror could conclude that the SSA should have known that the alternatives it offered were insufficient. *See supra* Section III.B.1. In *Cloe*, the alternatives were theoretically responsive to the plaintiff's request but did not work in practice. *See* 712 F.3d at 1178–79. Here, based on the record, it is not unreasonable to conclude that the offer of a workstation move, noise-cancelling headphones, and a white-noise machine did not even theoretically address the need for stability and predictability articulated in the letter from Tate's psychiatrist. [47-6] at 10. And, as discussed above, a reasonable juror could conclude that the SSA did not consider Tate's request in good faith. *See supra* Section III.B.2.

Bisignano also argues that the delay was reasonable because Tate's request was under "active consideration." [52] at 6–7. A delay resulting from active consideration of a request can indeed weigh in favor of reasonableness, but that isn't what happened here. A comparison with *Smith v. CSRA*, 12 F.4th 396 (4th Cir. 2021), is illustrative. In that case, the plaintiff was an independent contractor with the Drug Enforcement Administration who requested a parking pass as a reasonable accommodation. *Id.* at 403–04, 414. The DEA issued the plaintiff a parking pass five weeks later. During that period, the plaintiff provided updated medical

documentation at the DEA's request, and the DEA inquired into what accommodations it could offer the plaintiff in her capacity as a contractor under the law, DEA policy, and the building lease, which generally prohibited contractors from parking in DEA facilities. *Id.* at 415. The court held that the five-week delay was not unreasonable "given that [plaintiff's] request was under consideration." *Id.*

In contrast to *Smith*, the evidence here suggests that the SSA's active consideration of Tate's request was sporadic, not continuous. Tate spoke to her immediate supervisors about her request in November and December 2019, [50] ¶ 16–17; 19–21; [47-6] at 24–26; [47-5] at 2–8, and they recommended granting the request to Rabaut, who had authority to approve but not to deny the request, [50] ¶¶ 18; [47-4] at 26 ¶ 7, sometime before January 3, 2020. *See* [52-1] ¶ 10; [47-4] at 27 ¶ 12; [47-4] at 31. On January 7, Rabaut recommended denial of the request to Stenzel, the only person with authority to deny the request. [50] ¶¶ 18, 24; [47-4] at 27–28 ¶ 13. There is no evidence suggesting that Stenzel gave any consideration to the request until Bates, an analyst in her office, emailed Tate on March 18. [50] ¶ 25; [47-4] at 28 ¶ 14; [47-4] at 36; [47-5] at 33–34. The more than two months of inactivity between Rabaut's recommendation and Bates's email is almost double the five weeks of active consideration in *Smith*, 12 F.4th at 415. A juror could reasonably conclude that Tate's request was not under active consideration while she awaited a decision.

Finally, Bisignano argues that the duration of the delay—approximately three months from Tate's request until she went on leave, [50] ¶¶ 13, 43; [47-3] at 65 ¶ 10; [47-4] at 3—weighs in favor of reasonableness. [52] at 4, 7–8. He rightly points out

that there are cases in which delays of this length or longer have been found reasonable. [52] at 7–8 (citing *Oakley v. DeJoy*, No. 5:23-CV-42-FL, 2024 WL 1286205, at \*7 (E.D.N.C. Mar. 26, 2024) (four months); *Mullin v. U.S. Dep't of Veterans Affs.*, 149 F.4th 1244, 1255 (11th Cir. 2025) (three months); *Pelton v. DeJoy*, No. 19-1766 (LLA), 2024 WL 1961297, at \*6 (D.D.C. May 3, 2024) (three months)). Here, however, the three-month delay must be considered in context: If Rabaut had heeded the recommendation of Tate's supervisors, [52-1] ¶ 10; [47-4] at 27 ¶ 12, Tate could have received approval for full-time telework in early January 2020, just over one month after she submitted her request. *See* [47-4] at 27–28, ¶¶ 12–13. Instead, Rabaut recommended denial for an apparently baseless reason, *see supra* Section III.B.2, and Tate had to continue working under conditions that progressively exacerbated her mental illness until she had to take a leave of absence in late February. On this record, a jury could reasonably conclude that any delay past early January was unreasonable.

At bottom, based on the totality of the circumstances, a reasonable jury could conclude that the entirety of Tate's leave of absence resulted from the SSA's unreasonable delay. It would thus be inappropriate to preclude Tate from receiving redress for her leave of absence, even the portion that came after the SSA's implementation of its COVID-19 telework policy. The Court denies Bisignano's motion to limit Tate's available remedies.[5]

---

[5] Notwithstanding this denial, Tate may not seek an order requiring the SSA to allow her to telework full time without any annual review. *See supra* p. 11 n.3.

## IV.    Conclusion

For the foregoing reasons, Bisignano's motion for summary judgment or to limit Tate's recovery [46] is denied. The parties are directed to meet and confer on a potential trial date and the possibility of settlement. The Court sets a status hearing on January 26, 2026, at 9:30 a.m. to discuss these two options.

ENTER:

_____
Georgia N. Alexakis
United States District Judge

Date: January 12, 2026